Harry LEWIS and Sylvia Baker,
Plaintiffs,

v.

William H. ANDERSON, George L. Bagnall, S. Clark Beise, Shirley T. Black, Roy E. Disney, Ronald W. Miller, Richard T. Morrow, Donn B. Tatum, E. Cardon Walker, Raymond L. Watson, Gordon E. Youngman and Walt Disney Productions, Defendants.

No. CV–76–549–IH.

United States District Court,
C. D. California.

March 11, 1981.

**234**

Garwin, Bronzaft & Gerstein by Bruce E. Gerstein and Bertram Bronzaft, New York City, for plaintiff.

Beardsley, Hufstedler & Kemble by Seth Hufstedler and Laurie Zelon, Los Angeles, Cal., for defendant Disney.

Thomas Ready, Los Angeles, for Outside Director defendants.

, Donovan, Leisure, Newton & Irvine by Jean Prewitt, New York City, for other defendants.

## OPINION GRANTING IN PART AND DENYING IN PART PLAINTIFFS' APPLICATION FOR ATTORNEYS' AND ACCOUNTANTS' FEES AND EXPENSES

IRVING HILL, District Judge.

This is a stockholders derivative action. Plaintiffs' charges are detailed in their supplemental amended complaint filed July 1, 1976 (hereinafter referred to as "the complaint"). Those charges center on the company's grant of stock options to various officers and other employees, some of whom are also directors. A Stock Option Plan was adopted in 1973. It was approved by the shareholders prior to its adoption. After its adoption, the price of the company's stock apparently fell substantially in the general stock market collapse of 1973. In 1974, the Stock Option Committee of the Board of Directors, without any approval of the shareholders, granted to many of the same persons who were grantees under the 1973 plan, additional stock options at much lower prices. These were conditioned on each optionee's surrender of options previously granted to him under the 1973 plan.

The complaint charged that the November, 1974, grant of options constituted an invalid amendment of the 1973 plan because of the reduction in price and because it increased the total number of shares grantable. The complaint also contended that the proxy statements prepared by management soliciting shareholders' approval of the 1973 plan were false and misleading within the meaning of Sec. 14 of the 1934 Securities Exchange Act for failure to disclose certain material information. The complaint alleged that similar violations of Sec. 14 occurred in the 1975 and 1976 proxy statements.

The complaint also alleged that the 1974 grant, as to certain of the grantees, violated Sec. 10(b) of the 1934 Securities Exchange Act. It asserted that when the 1974 grants were made, certain grantees had inside information indicating that the market price of the stock would soon rise significantly.

The complaint also asserted that under the 1974 grant, the price fixed for exercise of the options, being substantially lower than the price under the 1973 plan, constituted spoilation and waste of the company's assets and was without consideration. The complaint also charged the individual defendants with breach of their fiduciary duties to plaintiffs.

Not long after this action was filed, the Board of Directors of the company created a Special Litigation Committee consisting of three directors against whom plaintiffs made no charges. The function and purpose of the Special Litigation Committee was first, to retain and seek the advice of separate counsel, and thereafter to consider whether or not the litigation should be pursued by the company (or by stockholders on behalf of the company) under the so-called business judgment rule. The committee retained independent counsel and conducted meetings and an investigation. Before coming to a determination about pursuing the litigation, the committee suggested to the Board that the Board should seek stockholders' ratification of the Stock Option Committee's authority to make the 1974 grant. Such ratification was solicited by

the Board from the stockholders and was obtained. Thereafter, the Special Litigation Committee decided that further prosecution of the litigation was not in the best interests of the company or its stockholders.

Relying on the committee's decision not to pursue the action, defendants, in 1977, moved this Court for a summary judgment which would dismiss the entire action. Although a judgment dismissing the action was denied, the motion resulted in a declaration of law by this Court that the action would be dismissed under the business judgment rule if, after a mini-trial, it was determined that the Special Litigation Committee had acted independently and in good faith. The said declaration of law by this Court is unpublished. It was affirmed on appeal, *Lewis v. Anderson*, 615 F.2d 778 (9th Cir., 1979) and the Supreme Court denied certiorari, —— U.S. ——, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980).

The mini-trial was never held. Plaintiffs' counsel undertook preparatory discovery and came to the conclusion that they could not prevail on the issues involving the independence and good faith of the Special Litigation Committee as required by the Ninth Circuit in *Lewis v. Anderson, supra.*

On December 15, 1980, plaintiffs' counsel made an oral motion to dismiss the action with prejudice. In connection with that motion, counsel filed a petition asking the Court to award to them, from the company, attorneys' and accountants' fees and expenses in the total amount of $381,210.36. Notice of the proposed dismissal of the action has been sent to the stockholders of the company pursuant to F.R.Civ.P. 23.1 and a Court hearing on the matter is set for March 16, 1981. The petition for attorneys' and accountants' fees was argued December 15 and 16, 1980, and was submitted. The argument was based on the assumption by both sides that the action will be dismissed as requested. This opinion is written on the same assumption.[1]

A discussion of the law applicable to the case requires the Court to address initially the question of what law governs. The parties have not taken an express position on this issue. Each side cites and relies upon some Federal cases and some California State cases. Cases from other states, especially Delaware, are also cited, but both sides recognize that they have no precedential value in this Court. The company, Walt Disney Productions, is a California corporation with its principal place of business in this State. There is total diversity of citizenship between plaintiffs and defendants. Violations of Federal securities laws and diversity of citizenship are both asserted in the complaint as bases of Federal jurisdiction. A persuasive argument could be made that California law governs the instant problem since the action is a stockholders' derivative action involving a corporation incorporated in, and based in, California. An equally persuasive argument could be made that Federal law governs since the precise issue now before the Court is allowance of attorneys' fees and the action pends in a Federal Court. The allowance of attorneys' fees might well be characterized as procedural rather than substantive. Moreover, the action has Federal Law characteristics because violations of Federal securities law are charged.

I find it unnecessary to decide which law governs. Neither side has demonstrated that there is any significant difference between California law and Federal law on the point at issue. I will, therefore, assume them to be identical and will rely on both Federal and California cases.[2]

---

1. The decision on whether to permit the requested dismissal of the action cannot and will not be made until March 16, 1981. In reaching that decision, the Court will, of course, consider any objections to the proposed dismissal that may be filed. However, so far as the Court can determine, none have been filed up to the date of the signing of this opinion.

2. Plaintiffs particularly rely on a group of unreported cases from trial courts. None has in it what may be termed an opinion. The facts of each are not fully made clear by the fragmentary extracts which have been supplied. For that reason and because unreported cases are generally disregarded as precedents, I have given en no force or effect to any of those cases.

## DISCUSSION OF THE LAW RE ATTORNEYS' FEES

 Certain propositions of law applicable to this case are recognized in appellate decisions. First, plaintiffs in derivative actions may be awarded counsel fees even though no fund is created. *Fletcher v. A.J. Industries, Inc.*, 266 Cal.App.2d 313, 320, 72 Cal.Rptr. 146 (1968). Second, fees may be awarded even though the action terminates without a trial. For example, an award is proper if there is a settlement before trial which results in substantial benefits to the stockholders. *Fletcher v. A.J. Industries, supra*, at 325, 72 Cal.Rptr. 146; cf. *Schmidt v. Zazzara*, 544 F.2d 412 (9th Cir., 1976). Third, an award is likewise proper if the defendants, by their own acts, bring about beneficial measures and corporate changes sought in the complaint, thus mooting the case. *Reiser v. Del Monte Properties Co.*, 605 F.2d 1135 (9th Cir., 1979); *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188 (6th Cir., 1974). And in these situations where trial is rendered unnecessary because of settlement or mooting, fees may be awarded without any mini-trial or other showing that the claims · of plaintiffs would have prevailed if a trial had occurred. See *Reiser, supra*, at pg. 1140 fn. Besides the showing of a substantial benefit to shareholders proximately resulting from the bringing of the case, the only other showing needed upon which to predicate a fee award is that plaintiffs' claims were facially sufficient and would have survived a motion to dismiss on the pleading. Cf. *Kahan v. Rosenstiel*, 424 F.2d 161, 167 (3rd Cir., 1970) *cert. den.*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Chrysler Corporation v. Dann*, 43 Del.Ch. 252, 223 A.2d 384, 387 (Del.Supr., 1966); *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 879 (Del.Supr., 1980).

In the instant case, plaintiffs survived a summary judgment motion. *A fortiori* their complaint would have survived a motion to dismiss on the pleadings.

 Certain other propositions of law seem sound even though appellate decisions are lacking. Where the corporation voluntarily undertakes a remedial act or change in corporate structure, which is *not* the proximate result of the action, plaintiffs are not entitled to attorneys' fees and expenses even though the act or change is significantly beneficial to the shareholders. Fees are denied in such situations even though it appears that *but for* the bringing of the action the corporation would never have undertaken to review its own practices and might never have made the beneficial act or change at all. This denial is supported by public policy. To reward plaintiffs' counsel for corporate benefits not proximately resulting from the filing of their case, might well result in a proliferation of marginal derivative actions. Such actions would be brought in the hope that substantial counsel fees would be awarded even though the action did not succeed. Counsel could anticipate that the commencement of a derivative action might motivate a corporation to review generally all of its practices in such areas as executive compensation, content of proxy statements and the decision as to what matters should be submitted for shareholders approval. Counsel could also reasonably anticipate that the corporation might determine to make changes and improvements in areas not involved in the suit. Counsel would, thereafter, seek fees on account of such changes having been made even though they were not directly attributable to the lawsuit. If such fees were awarded, plaintiffs' counsel would be getting a free ride. The award of such fees would also result in discouraging corporations from reviewing, on their own initiative, corporate structure and policy and thereafter taking remedial actions. In the Court's view, such voluntary reviews and actions should be encouraged and not penalized.

 The rules of law hereinabove summarized makes an award of counsel fees dependent on a finding of proximate causation. In cases of this kind, it may not always be easy to determine whether beneficial action undertaken by the corporation was or was not a proximate result of the bringing of the action. One method the Court believes to be sound would simplify

the inquiry. Where the remedial action taken by the corporation was not included within the relief sought by the complaint (giving to its language all reasonable intendments) proximate causation would be deemed not to exist. Where the remedial action was taken following the commencement of the lawsuit and *was* included within the relief sought by the complaint (with reasonable intendments) proximate causation would be deemed to exist.

## APPLICATION OF THE LAW TO THE FACTS OF THE CASE

Plaintiffs' counsel contend that four separate corporate benefits were achieved in this case as a proximate result of their action, and they seek fees for services expended in achieving each of them. They are:

1) The corporation's submission of the 1974 grant to the stockholders for their ratification and the consequent ratification.

2) The establishment of the Special Litigation Committee, its retention of independent counsel, and its investigation thereafter which resulted in the exercise of the business judgment rule.

3) Terming the decision in the opinion of the Ninth Circuit in *Lewis v. Anderson, supra,* a corporate benefit because it established the law where no definitive decision had previously existed, counsel seek compensation for their services in this Court and the Court of Appeals in resisting the application of the business judgment rule. In this connection, they also seek fees for their services after *Lewis v. Anderson* became final, in determining whether to go forward with the mini-trial on the issues of the independence and good faith of the Special Litigation Committee.

4) The disclosure to the stockholders in a 1980 proxy statement of the fact that certain officers of Disney had been allowed to purchase a profit-sharing interest in Disney Productions without risk of loss.

I have decided to grant attorneys' fees and expenses for 1, above, and to deny them for 2, 3 and 4, above. Each claimed benefit will be separately discussed.

1. Stockholder Ratification of the 1974 Grant.

Plaintiffs have lost their case and at first blush it seems anomalous to award any fees to counsel for losing parties. But there are precedents for awarding counsel fees to parties who have failed to succeed in a stockholders derivative action. For example, where the corporation on its own takes the remedial action sought by plaintiffs in the lawsuit, the case is thereby mooted and, in a sense, plaintiffs have lost it. But since the remedial action taken by the corporation is the proximate result of the lawsuit, fees are properly awarded. See citations on the point, *supra.* Another type of award to losing counsel was made by the Supreme Court itself in *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) and 552 F.2d 1239 (7th Cir., 1977). The derivative action in *Mills* challenged as false and misleading a proxy statement seeking authorizations for a merger. However, the action was not filed until the merger had taken place. The Supreme Court decided that the proxy statement violated Federal law but the posture of the case was such that, until further proceedings in the trial court, it could not be determined if plaintiff would gain any relief despite the corporation's violation of law. As indicated in the 1977 Court of Appeals holding, plaintiffs eventually lost the case; they did not succeed in getting any of the relief for which they prayed. Nevertheless, they were awarded attorneys' fees in the middle of the case by order of the Supreme Court. The Supreme Court apparently felt that for plaintiffs' counsel to have established that defendants' proxy statements violated the law, was, in and of itself, a sufficient corporate benefit to warrant the payment of counsel fees at that intermediate stage of the proceeding even if plaintiffs later failed to secure any relief at all.

In the instant action, plaintiffs probably lost the case because of the invocation of the business judgment rule. But the business judgment rule was successfully invoked because the corporation's submission of the 1974 grant for shareholder approval. Although one cannot be absolutely certain, it seems to me that the business judgment rule would probably not have been invoked against plaintiffs had the corporation not obtained ratification of the 1974 grant from its shareholders. Although the case was never tried on the merits, the Court did learn a good deal about the facts during the summary judgment motions. It appears to me that plaintiffs might well have succeeded in their claim that the 1974 grant was improper if the shareholder ratification had not taken place. But that ratification, which was retroactive to the original 1974 date (*Michelson v. Duncan*, 386 A.2d 1144, 1151 (Del.Ch., 1978), rev'd on other grounds, 407 A.2d 211 (Del.Supr., 1979); see also 407 A.2d at 219–20), effectively precluded further assertion of the claim and was a necessary predicate for invoking the business judgment rule. As I see it, on these facts, if plaintiffs' lawsuit produced a significant corporate benefit, their ultimate loss of the case is not fatal to their application for counsel fees.

Plaintiffs' lawsuit did produce submission of the 1974 grant to the stockholders for ratification. I find that to be a significant and substantial benefit to the shareholders. I find it to be an important act of "corporate therapeutics". *Mills, supra*, 396 U.S. at 396, 90 S.Ct. at 628. It also qualifies under the definition of substantial benefit used by the California Appellate Court in *Fletcher v. A.J. Industries, supra*. In that opinion, the Court said:

> The final question in the present case is whether the benefits realized by the corporation were sufficiently "substantial" to warrant the award. To find that they were, the trial court need not determine that abuses existed in the corporate management, and that the action corrected them. It will suffice if the court finds, upon proper evidence, that the results of the action "maintain the health of the corporation and raise the standards of 'fiduciary relationships and of other economic behavior,'" or "*prevent[s]* an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest." 266 Cal.App.2d at 324, 72 Cal.Rptr. 146.

The decision of Disney's Board to go to the shareholders for approval of the 1974 grant was an important vindication of shareholders' rights. It "raised the standards of fiduciary relationships" within the company and created a desirable precedent for the future. It was an assertion of corporate democracy, recognizing the paramount authority of the shareholders to place limitations on the power and authority of the directors.

I also find that the ratification was a proximate result of the institution of the lawsuit. As reflected in the complaint, the corporation's failure to obtain stockholder approval of the 1974 grant was central to plaintiffs' claim that the 1973 plan was violated and that waste of corporate assets had occurred.

2. The Establishment of the Special Litigation Committee and Its Investigation.

But for the bringing of the lawsuit, the Special Litigation Committee, I find, would not have been formed. However, I do not find its formation to be a proximate result of the lawsuit. The decision to form the committee was an independent act voluntarily undertaken by the corporation on its own initiative. In any event, the formation of the committee is in and of itself no corporate benefit. As to the committee's investigation, here, again, I find that this was not a proximate result of the lawsuit. The investigation was a voluntary act taken on the corporation's own initiative. It should be noted that nothing in the complaint seeks this type of corrective action, either the formation of such a committee or its later investigation. This alleged benefit is a classic illustration of the public policy

considerations discussed above, where independent action on the corporation's own initiative should not be penalized.

### 3. Establishing the Law.

 Plaintiffs claim that they are entitled to attorneys' fees for litigating, in this Court and the Court of Appeals, the applicability of the business judgment rule. They also seek compensation for services performed after the Court of Appeals decision was rendered; i.e., the investigation into whether the Special Litigation Committee, when it exercised its business judgment, was independent, independently advised and made a good faith determination. It must be conceded that the Ninth Circuit's opinion in *Lewis v. Anderson* was very important. It was apparently the first appellate opinion applying the business judgment rule in a Federal Court case and the first appellate application of the business judgment rule in a case charging violation of the Federal securities laws. But in my view, such services are not compensable. Whether the business judgment rule was applicable to this case was a question of law. Plaintiffs lost on that question. I can see no way in which settling that point of law benefitted the corporation or its stockholders.

The assertion of plaintiffs' counsel that, having begun the action, they had an obligation to the shareholders to litigate vigorously on the applicability of the business judgment rule may well be correct. But that obligation was a necessary consequence of commencing the action. An obligation which plaintiffs assumed by starting their lawsuit is not automatically a benefit to shareholders or the corporation.

The same reasoning is applicable to plaintiffs' claim that they should be paid for legal services connected with their investigation into whether the Special Litigation Committee was independent, independently advised and made a good faith determination to exercise the business judgment rule. Plaintiffs were obligated to make that investigation but the investigation was no benefit either to the shareholders or the corporation.

### 4. Disclosure of the Buy-Back Provision In Officers' Participation Interests in Company Productions.

 The allegations of the complaint have been summarized heretofore. As that summary reveals, no mention was made in the complaint of any charge of illegality or impropriety in connection with certain officers having an ownership interest in company motion picture productions.

Before 1970, some key employees, including some officers, were given the privilege of investing their own funds to obtain equity participation for themselves in company film productions. From 1970 on, key employees who thus obtained equity participation in film productions, were given the benefit of a sell-back option. This guaranteed the employees against loss. For a period of two years after the film came out, the employee had the option of selling his equity interest back to the company at his cost. It turns out that this option has never, in fact, been exercised.

Although proxy statements since 1970 have disclosed that certain employees have obtained equity participation in company films, no disclosure was made of the guarantee against loss. That feature was not disclosed to shareholders until 1980.

Plaintiffs claim that because some of their papers filed during the pendency of the lawsuit made reference to the failure to disclose the sell-back options, they are entitled to attorneys' fees for their services in obtaining the eventual disclosure thereof to the stockholders.

I have determined that no fees are awardable in this connection because the eventual disclosure was not a proximate result of the filing of the action. As revealed by various documents filed with the Court, the facts are these:

Plaintiffs' first assertion, in any Court document, that earlier proxy statements were improper for failure to disclose the sell-back options, occurred in briefs filed on January 3, 1978, in connection with the

summary judgment motion.[3] That motion was argued on March 10, 1978. No request has ever been made to the Court by plaintiffs to amend their complaint so as to introduce any issue relating to the sell-back options. In July, 1977, well before plaintiffs' first mention of the problem on January 3, 1978, the Special Litigation Committee hired the firm of Towers, Perrin, Foster & Crosby to study the compensation of Disney officers as compared with compensation of officers of other similar corporations. In August, 1977, the Towers firm issued its report specifically pointing out that the sell-back option should be considered as part of the compensation of the officers involved.

Since plaintiffs never attempted to amend their complaint so as to seek any relief in connection with the sell-back options, I must and do conclude that neither the act of informing the Board that such sell-back options constituted compensation nor the act of informing the stockholders of the sell-back options in the 1980 proxy statement, was a proximate result of the litigation. It was beneficial for the stockholders to be told of the existence of the options and I have no idea as to why the Board waited until 1980 to disclose them. But all disclosures of the options were the proximate result of the corporation's own voluntary actions, including its voluntary survey of the comparative compensation of its officers.

### FURTHER PROCEEDINGS

As herein ordered, attorneys' fees and costs will be awarded only for services per-

formed up to the point when the 1974 grant was ratified by the shareholders. There will be no award for any services after the date of ratification. The Court is not now in possession of any evidence which would permit either a proper percentage allocation of the total requested by plaintiffs [4] or a finding that any particular sum is reasonable for the services up to the cut-off point. Defendants' counsel requested an opportunity to make further discovery if an award of any fees was ordered by the Court and they are entitled to do so. Each side is entitled to present evidence as to what the award should be and to argue the matter.

Counsel for both sides are requested to confer concerning a schedule for such further proceedings. Counsel are requested to be present in Court on Monday, March 30, 1981, at 2:00 p. m. for a status hearing and so that the Court may schedule a further hearing and argument on the matter. Counsel are urged to discuss possible settlement of the figure so that further discovery and Court proceedings will be obviated.

3. In a letter from counsel to the Court dated December 19, 1980, plaintiffs point to the depositions of three corporate officers taken in June, 1977, as evidence of their general interest in the participation privilege afforded to some of the key employees. I have read the deposition references cited by counsel and find no mention in any of them of the sell-back options. I must conclude that plaintiffs and their counsel did not learn of the existence of the sell-back options until the Towers, Perrin, Foster & Crosby report of August, 1977.

4. I am aware of the position taken by plaintiffs' counsel that the fair and reasonable value of

the services for which they seek compensation would be in excess of $600,000. By limiting their request to a total of $381,210.36, counsel have implicitly recognized that, under any circumstances, they should receive less than the fair value of the services rendered in view of the limited results obtained. I have no idea of the formula or rationale which counsel used in reducing the request to $381,210.36. But I regard that figure as the maximum which would be awarded if all the services were compensable. That figure will necessarily have to be reduced substantially in view of the Court's holding.